UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHARTIS SEGUROS MEXICO, S.A. de
C.V., as subrogee of PROLEC GE
INTERNATIONAL, S. de R.L., de C.V.,
       Plaintiff,

       - against -

HLI RAIL & RIGGING, LLC, FRESH
MEADOW MECHANICAL CORP., and KANSAS
CITY SOUTHERN RAILWAY COMPANY,
       Defendants.
------------------------------------------------------------X
HLI RAIL & RIGGING, LLC, FRESH
MEADOW MECHANICAL CORP.,
       Third-Party Plaintiffs,

       - against -

FIREMAN'S FUND INSURANCE COMPANY
and CITY UNDERWRITING AGENCY, INC.,
       Defendants.
------------------------------------------------------------X

11 Civ. 3238 (ALC)(GWG)

ORDER AND OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-13-14

**ANDREW L. CARTER, JR., United States District Judge:**

    A train derailment has set off a chain reaction of claims and cross-claims that question

the applicability of the Carmack Amendment, 49 U.S.C. § 11706, the default scheme for rail

carriers' liability for goods entrusted to their transport. As a general rule, under the Carmack

Amendment, rail carriers are liable for the full value of the goods damaged after receipt by the

carrier. However, rail carriers may limit their liability either by entering into a contract pursuant

to 49 U.S.C. § 10709, which would not be covered by the Carmack Amendment, or, if the

contract is governed by the Carmack Amendment, by first effectively limiting their liability

according to the manner required by that statutory scheme.

The present motion was brought by Defendant Kansas City Southern Railway ("KCSR"), seeking partial summary judgment to limit its liability to $25,000 per car for damage to cargo resulting from the derailment of a KCSR-operated train.  Co-Defendant HLI Rail & Rigging ("HLI") brings a cross-motion for summary judgment, seeking dismissal of KCSR's affirmative defense that its liability should be limited to $25,000 per car.[1]  Plaintiff Chartis Seguros Mexico ("Chartis") as subrogee of the cargo owner Prolec GE ("Prolec") also brings a cross-motion for summary judgment that Prolec has set forth a *prima facie* claim for Carmack liability.[2]  For the reasons set forth below, KCSR's motion for partial summary judgment (Dkt. No. 92) is denied.  HLI's cross-motion for partial summary judgment (Dkt. No. 123) is granted.  Chartis's cross-motion for a finding of a *prima facie* Carmack liability (Dkt. No. 116) is denied.

## BACKGROUND

On March 14, 2010, a train operated by Kansas City Southern Railway ("KCSR") derailed near Benavides, Texas.  The train was en route from Laredo, Texas to Port Arthur,

---

[1] Although KCSR also contends that HLI challenges KCSR's cross-claim for indemnification (Mem. in Response to the Cross-Motion for Partial Summary Judgment of HLI and FMMC, Dkt. No. 141, at 2), HLI's memoranda only discuss dismissal of KCSR's limited liability affirmative defense.  Furthermore, HLI's cross-motion only seeks an order dismissing KCSR's "Seventh Affirmative Defense and Cross-Claim against Defendants HLI and FMMC, that seek to limit KCSR's liability to $50,000 in this matter." (Dkt. No. 123).  Thus, the Court will only consider HLI's motion concerning the disposition of the limited liability affirmative defense. To the extent KCSR would like the Court to consider summary judgment on its indemnity claim, this issue was not noticed in KCSR's motion (Dkt. No. 92) and consequently was not fully briefed. The Court will not decide the merits of KCSR's indemnity cross-claim at this time.

[2] Although Chartis's cross-motion sets out the wider landscape of carrier status of both KCSR and HLI, (see Dkt. No. 120, at 12, 15), it only seeks a determination as to KCSR's liability, (id. at 14 (stating the elements required to "establish a prima facie case to recover under the Carmack Amendment *as against KCS* as the receiving rail carrier") (emphasis added)).  Accordingly, the Court will limit its inquiry to whether Chartis has made a *prima facie* claim against KCSR only.

Texas when it derailed and damage occurred to at least two railcars, each containing an electric transformer owned by Prolec GE International ("Prolec"). The transformers were allegedly damaged beyond repair or use. The transformers were allegedly valued at $3,213,210.00, but deducting for salvage value, the total amount of Prolec's claim was $2,356,066.22. (Chartis Rule 56.1 Stmt ¶ 19-20; Declaration of Alfonso Torres in Support of Chartis's Cross-Motion for Summary Judgment (Dkt. No. 117) ("Torres Decl.") Ex. I and J).

On May 12, 2011, Prolec commenced a lawsuit against KCSR, HLI Rail & Rigging ("HLI")—the company responsible for the transport—and Fresh Meadow Mechanical Corporation ("Fresh Meadow"), which operates HLI as a wholly-owned subsidiary. Prior to filing its complaint, Prolec had filed a claim with its subrogee/insurer, Chartis Seguros Mexico ("Chartis"). Having been reimbursed by Chartis, Prolec was dismissed as a plaintiff and Chartis was added as the proper plaintiff in the first Amended Complaint on July 6, 2011.[3]

Prior to the derailment, Prolec had entered a Memorandum of Understanding ("MOU") with HLI for provision of transportation services, with HLI essentially acting as a logistics coordinator. (Torres Decl. Ex. A). The MOU contemplated a long-term relationship for transportation services. HLI arranged transport for Prolec factory in Apodaca, Nuevo Leon, Mexico to the U.S.-Mexico border. (Declaration of Michael Scott dated November 9, 2012 ("Scott Decl.") (Dkt. No. 128) ¶¶ 6-7). HLI then subcontracted the transport between Laredo and Port Arthur, Texas to KCSR.

---

[3] Chartis added Fireman's Fund Insurance Company and City Underwriting Agency (insurers for HLI/Fresh Meadow) as defendants in its Second Amended Complaint filed August 4, 2011 (Dkt. No. 18), but voluntary dismissed the complaint as to those defendants on September 14, 2011 (Dkt. No. 46). They remain in the case now as third-party defendants and cross-claimants.

Which documents govern HLI's subcontract with KCSR is the subject of greater dispute. KCSR contends that the contract is formed by reading three documents in tandem: the Confidential Rail Transportation Price ("Price Quote")[4], two bills of lading dated March 10, 2010 (collectively, the "BOLs")[5], and the Rules Publication KCS 9012 ("Rules Publication")[6]. The theory behind KCSR's motion for summary judgment is that its liability is limited to $25,000 per car, a sum stated in the Price Quote, which was incorporated into the BOLs. Further, KCSR effectively limited its liability by providing the opportunity for full Carmack liability in the Rules Publication, which was referenced in the Price Quote. To the contrary, HLI argues that KCSR did not effectively limit its liability because it had no notice of the Rules Publication and, at a minimum, full Carmack protection did not apply or was not provided for this shipment.

1. Price Quote

The Price Quote applies to electrical transmission or distribution equipment and was effective from November 25, 2009 through December 31, 2010. The Price Quote lists the following "General Shipment Conditions":

> Mileage allowance payments will not apply;
> Switching charges at both origin and destination will not be absorbed;
> Price is not subject to Rule 24 of UFC;
> Price is not subject to Rule 34 of UFC;
> Subject to maximum liability of 25000.00 per car;
> Price applies to United States funds;

---

[4] The Price Quote is provided in the Declaration of Brian Formanek in Support of KCSR's Motion for Partial Summary Judgment (Dkt. No. 101) ("Formanek Decl.") as Exhibit 3.

[5] The Bills of Lading ("BOLs") are provided in the Formanek Declaration as Exhibit 7 and in the Torres Declaration as Exhibit C.

[6] The Rules Publication is provided in the Formanek Declaration as Exhibit 5 and in the Declaration of Lawrence C. Glynn in Support of HLI's Cross Motion for Summary Judgment as Against Kansas City Southern (Dkt. No. 118) ("Glynn Decl.") as Exhibit C.

4

Charges for Weighing are not included in the price;
Price is subject to cancellation on 20 day(s) notice;
Price is subject to 9012;
Price is subject to UFC tariff 6000;
Price is subject to fuel surcharge based on mileage;
The Mileage Basis being utilized is Fuel Surcharge Miles. [. . .]

The Price Quote also requires all shipping documents to make reference to the price

authority KCS QB 36123 as well as "the seven digit STCC (where applicable), Origin,

Destination and Equipment Identification Number on their face when tendered to the Origin

Carrier." (Formanek Decl. Ex. 3). The Price Quote provides a rate for "Laredo, TX to

Beaumont, TX; Port Arthur, TX." (Id.) The rate for shipments with a minimum weight between

150,000 and 200,000 pounds is listed as $7.25 per hundred weight. (Id.)

   2. Rules Publication KCS 9012

KCSR contends that Rules Publication KCS 9012 (the "Rules Publication") was

incorporated into the Price Quote because of the phrase "Price is subject to 9012." Revision 8 of

the Rules Publication was in effect at the time of the derailment and sets forth KCS's conditions

of carriage, namely the "rules and related provisions applicable to rail transportation of

commodities moving in interstate and intrastate commerce via the Kansas City Southern Railway

Company (KCS) and Gateway Eastern Railway Company (GWWE)."

   1. Item 5: "KCS Website"

Item 5 explains the availability of the Rules Publication as follows:

This publication is available on the Internet for viewing or sending directly to
your printer. The KCS Home Page address is http://www.kcsouthern.com . From
the Home Page choose the 'Customers' link, click 'Pricing and Rules
Publications' then click the 'Rules Publications 9012' link.  An annual $100.00
subscription fee will be assessed for those who wish to receive a hard copy.

> If you are not equipped to obtain a copy of this publication from KCS' web site, a hard copy will be mailed to you, if you submit a formal written request to the following address. . .
>
> In accordance with the Surface Transportation Board's policy decision under Ex Parte 528, Disclosure, Publication and Notice of Change of Rates and Other Service Terms for Rail Common Carriage, the request must be made annually in writing.

Rules Publication, at Item 5.

> 2. Item 80: "Carrier Liability – Loss and Damage to Lading"

Item 80 includes the following "[g]eneral" provision about default coverage and full value coverage under the Carmack Amendment:

> A)      On domestic moves that originate in the United States of America, shipper may, at their option, select freight loss and damage liability provisions set forth in 49 U.S.C.A., Section 11706 (Carmack) as explained in this item.  If 49 U.S.C.A. Section (Carmack) is not selected, the liability provision of this item will govern.

Rules Publication, at Item 80 (General).  The liability provisions provide for liability as at common law except as provided.  One of the "Liability Restrictions," among others, reads as follows:

> (D)      Unless amended by written agreement prior to shipment, rail carrier's liability for the contents of any rail car will be limited to the actual value of the cargo or $50,000.00, whichever is the lesser of the two amounts.

Rules Publication, at Item 80 (Liability Restrictions).

> Under a section titled "Carmack Liability," Item 80 also provides:
>
> 49 U.S.C. Section 11706 provides for full value liability and other liability terms for the rail carriers and the shipper.  To make a shipment pursuant to the terms of 49 U.S.C. Section 11706, the shipper must comply with all of the following provisions:
>
> 1) Shipper must notify rail carrier no less and [sic] seventy-two (72) hours before the rail car is released for transportation that the shipper chooses Carmack Liability protection.

6

2) The shipper must have prepaid the Carmack Liability Rate obtained from KCS' Marketing Department.

3) The shipping instructions are subject to a specific pricing authority, which shall be specifically noted.

4) Carmack liability coverage is not available for shipments that originate in Mexico.

Rules Publication, at Item 80 (Carmack Liability).

3. Bills of Lading

The Bills of Lading ("BOLs") are "subject to terms and conditions of the Uniform Straight Bill of Lading form as printed in the Uniform Freight Classification in effect as of date shipped." Bill of Lading Number G2357-01 indicates that the Origin City is Laredo, TX and the Destination City is Port Arthur, TX, with a total net weight of all cars 197065 for Equipment ID: KRL 90016. Bill of Lading Number G2357-02 indicates the same route and total weight for Equipment ID: KRL 388002. The "Contract/Price Quote" on both BOLs is KCS QB 36123. The BOLs do not explicitly refer to the Rules Publication, include a stated value of the cargo, or ostensibly provide a place where the shipper can declare the value of the cargo. However, KCSR contends that the Rules Publication was incorporated into the BOLs because it was referred to in the Price Quote in the phrase "Price is subject to 9012."

The issue here, unlike most cases, is not whether HLI was aware of a limitation of liability in the Price Quote, which it has admitted.[7] The issue rather is whether HLI was offered full coverage liability as required by the Carmack Amendment such that the limitation of liability clause was effective. But before that may be addressed, the Court must decide two preliminary

---

[7] The Court is satisfied that HLI was at least notified of the limitation of liability provision by virtue of the Price Quote and Raul Ortega's statement that HLI was "aware of the limited liability with the KCS." (Declaration of Steven Sigler ("Sigler Decl.") Ex. 2).

matters:  whether, as HLI questions, the Carmack Amendment applies at all and whether, as

KCSR contends, the parties actually formed a contract pursuant to 49 U.S.C. § 10709.

DISCUSSION

I.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c).  There is no issue of material fact where the facts are irrelevant to

the disposition of the matter.  Speculation, conclusory allegations and mere denials are not

enough to raise genuine issues of fact.  National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton

Ins. Ltd., 696 F. Supp. 897, 900 (S.D.N.Y. 1988).

The burden lies with the moving party to demonstrate the absence of any genuine issue of

material fact and all inferences and ambiguities are to be resolved in favor of the nonmoving

party.  See Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. &

Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d

Cir. 2002).  If "no rational jury could find in favor of the nonmoving party because the evidence

to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper." Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224

(2d Cir. 1994).  Conversely, if reasonable minds could differ, summary judgment is

inappropriate.

Once the moving party meets its burden of showing the absence of a genuine issue of

material fact, the opposing party must produce evidentiary proof in admissible form sufficient to

raise a material question of fact to defeat the motion for summary judgment or demonstrate an

8

acceptable excuse for its failure to meet this requirement.  See, e.g., Cifarelli v. Village of

Babylon, 93 F.3d 47, 51 (2d Cir. 1996); Ortiz v. Makram, No. 96 Civ. 3285(AGS), 2000 WL

1876667, at *4 (S.D.N.Y. Dec. 21, 2000).

On cross-motions for summary judgment, the court must consider each motion

independently of the other and when evaluating each, the court must consider the facts in the

light most favorable to the non-moving party.  Sciascia v. Rochdale Village, Inc., 851 F. Supp.

2d 460 (E.D.N.Y. 2012) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.

1993)); Zaccaro v. Shah, 746 F. Supp. 2d 508 (S.D.N.Y. 2010).  However, because KCSR's

motion and HLI's cross-motion are two sides of the same coin (i.e., whether KCSR can prevail

on a limitation of liability defense), I consider them together.

II.  Background on the Carmack Amendment

The parties first dispute the applicability of the Carmack Amendment, codified at 49

U.S.C. § 11706, to this shipment.  The Carmack Amendment was first enacted in 1906[8] and

created "a national scheme of carrier liability for goods damaged or lost during interstate

shipment under a valid bill of lading."  Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.,

456 F.3d 54, 58 (2d Cir. 2006) ("Sompo I"), abrogated on other grounds, Kawasaki Kisen Kaisha

Ltd. v. Regal-Beloit Corp. ("Regal-Beloit"), 130 S. Ct. 2433 (2010) (citation omitted).

The Carmack Amendment "governs the terms of bills of lading issued by domestic rail

carriers."[9]  Regal-Beloit, 130 S. Ct. at 2440.  For rail carriers, it currently reads, in relevant part:

---

[8] "Originally codified at 49 U.S.C. § 20(11), Carmack was recodified in 1978 at 49 U.S.C. §
11707 and then recodified again in 1996 at 49 U.S.C. § 14706.  The current version of Carmack
is codified at 49 U.S.C. § 11706."  Sompo Japan Ins. Co. of Am. v. Norfolk Southern Rwy. Co.,
540 F. Supp. 2d 486, 492 n.4 (S.D.N.Y. 2008) ("Sompo II") (internal citations omitted).

[9] A bill of lading "records that a carrier has received goods from the party that wishes to ship

A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation Board (STB)] under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by—

(1) the receiving rail carrier;

(2) the delivering rail carrier; or

(3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.

49 U.S.C. § 11706(a); see also 49 U.S.C. § 14706(a) (motor carriers).

When a rail carrier loses or injures the property it is carrying, under Carmack the carrier is liable for "the actual loss or injury to the property" for damage caused during the rail route under the bill of lading. 49 U.S.C. § 11706(a)(1). Carmack thus permits a shipper to recover for the actual damage or loss from either the delivering carrier or the receiving rail carrier regardless of which carrier caused the damage and regardless of whether the carrier actually issued a bill of lading so long as they were required by Carmack to do so. Regal-Beloit, 130 S. Ct. at 2441. In doing so, it relieves cargo owners "of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." Reider v. Thompson, 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950).

To promote competition in the rail industry, several acts followed to deregulate certain shipments. The Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94–210, 90 Stat.

---

them, states the terms of carriage, and serves as evidence of the contract for carriage." Regal-Beloit, 130 S.Ct. at 2439 (quoting Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 18-19, 125 S.Ct. 385 (2004); Sompo II, 540 F. Supp. 2d at 492 n.5.

31 (1976), authorized the Interstate Commerce Commission (now known as the Surface

Transportation Board ("STB")), to exempt specified rail services from certain regulations. The

Staggers Act, Pub.L. No. 96–448 (1980), continued deregulation by providing mechanisms for

rail carriers to transport goods at negotiated contract rates rather than at prescribed common

carrier rates through exemption under 49 U.S.C. § 10502 or private contract under 49 U.S.C. §

10709. See Schoenmann Produce Co. v. Burlington Northern and Santa Fe Ry. Co., 420 F.

Supp. 2d 757, 762 (S.D. Tex. 2006); Sompo II, 540 F. Supp. 2d at 492. The Interstate

Commerce Commission Termination Act of 1995 ("ICCTA"), 109 Stat. 803 (1995), codified in

49 U.S.C. § 10501(b), completed the deregulatory trend by abolishing the tariff filing

requirement and the filed-rate doctrine.[10]

I

<strong>KCSR's Motion for Limitation of Liability</strong>

I.   Whether the Carmack Amendment Applies

The first question necessary for resolution is whether the Carmack Amendment applies to

this transport. HLI contends that the Carmack Amendment does not apply for one of two

reasons: either because the shipment originated in Mexico or because the transport was entirely

within the state of Texas and so did not involve interstate commerce. I first consider whether the

Carmack Amendment is inapplicable for a third reason: because the contract was entered

---

[10] Although the term "tariff"—an anachronism from the period when common carriers had to publish rates with the ICC—is still used, "a tariff simply refers to a carrier's standard contract terms, which have no effect apart from their status as contracts." Saacke North America, LLC v. Landstar Carrier Services, Inc., NO. 5:11CV107-RLV, 2012 WL 6590487, *7 (W.D.N.C. Dec. 18, 2012) (citing Tempel Steel Corp. v. Landstar Inway, Inc., 211 F.3d 1029, 1030–31 (7th Cir. 2000)) (internal quotation marks omitted).

pursuant to 49 U.S.C. § 10709 as sometimes contended by KCSR.  Under any of these

arguments, I conclude that the Carmack Amendment applies to the BOLs at issue here.

    A.  Whether Bill of Lading is a § 10709 Contract

    One of KCSR's primary arguments is that the contract with HLI is a contract pursuant to

49 U.S.C. § 10709.  (Dkt. No. 93, KCSR Mem. for Partial Summary Judgment on Limitation of

Liability, at 6-8).  Section 10709 provides that "[o]ne or more rail carriers providing

transportation subject to the jurisdiction of the Board under this part may enter into a contract

with one or more purchasers of rail services to provide specified services under specified rates

and conditions."  49 U.S.C. § 10709(a).  Section 10709 further provides that a "party to a

contract entered into under this section shall have no duty in connection with services provided

under such contract other than those duties specified by the terms of the contract."  49 U.S.C. §

10709(b).  Finally, and most important for this inquiry, Section 10709 provides that a "contract

that is authorized by this section, and transportation under such contract, shall not be subject to

[the Carmack Amendment]."  49 U.S.C. § 10709(c)(1).

    1.  Interplay With 49 U.S.C. § 10502

    As an initial observation, many cases that appear to require an offer of Carmack terms for

a § 10709 contract were in fact considering the effect of section 10502, a provision for shipments

exempted by the STB which requires an initial offer of Carmack terms before an alternative

terms can be extended.  E.g., Sompo II, 540 F. Supp. 2d at 498 ("What is not clear from the

statutory language or the case law, however, is how to read § 10502 and § 10709 in tandem.  I

conclude that rail contracts for the movement of cargo [by an exempted rail carrier] traveling on

the domestic rail leg of a continuous intermodal movement, such as the ITAs in this case, should

be read as § 10502 and not § 10709 contracts."), Schoenmann, 420 F. Supp. 2d at 758-59

(analyzing the interplay of 49 U.S.C. §§ 10709, 11706, and 10502 because shipper sought to

recover for damages to shipments exempt under § 10502); Tamini Transformatori S.R.L. v.

Union Pacific Railroad, 2003 WL 135722, at *7 (S.D.N.Y. Jan. 16, 2003) ("[The carrier] is

certainly correct to the extent that if UPCQ 80722.000 is a valid contract under 49 U.S.C. §

10709, then the Carmack protections (including full liability) do not apply. However. . . [the

carrier] ignores the fact that 49 U.S.C. § 10502(e) mandates that before an alternative contract is

agreed to, the statutory Carmack terms must be offered."); Consolidated Rail Corp. v. Sobiech,

710 F. Supp. 988, 990 (S.D.N.Y. 1989) ("Section 10505(e) [previous location of 49 U.S.C. §

10502] requires carriers to provide terms consistent with Carmack in the first instance. They may

offer terms alternative to Carmack, which may be accepted or rejected by the shipper. But in any

event, unless the shipper affirmatively elects the alternative limited liability terms, the Carmack

terms should apply.").

The requirements for a section 10709 contract standing alone are different from the above

scenarios where both statutes were in dispute:

> The terms of these two different provisions evidence a clear distinction between § 10502
> contracts and § 10709 contracts. The distinction is based on whether the transportation at
> issue in the contract is exempt from Board regulation. Whereas § 10502 requires carriers
> providing *exempt* transportation to offer Carmack protections before they can
> successfully contract for alternative terms, § 10709 contains no such language--indeed, it
> explicitly contemplates that *nonexempt* carriers' contracts alone control.

Regal-Beloit Corp. v. Kawasaki Kisen Kaisha Ltd., 557 F.3d 985, 1000 (9th Cir. 2009), rev'd on

other grounds, Regal-Beloit, 130 S.Ct. 2433 (2010).  A recent case reached the same conclusion

as follows:

> [O]ther courts have indicated that the Carmack Amendment applies *only* to "exempt"
> shipments. Under the Interstate Commerce Act's statutory scheme, "exempt"
> transportation is still subject to Carmack liability protection because Congress expressly
> precluded the Surface Transportation Board from exempting carriers from their

obligation to provide contractual terms for liability that are consistent with Carmack. *See* 49 U.S.C. § 10502(e). "[N]onexempt" shipments, on the other hand, are governed by 49 U.S.C. § 10709 and are not subject to the Carmack Amendment. Thus, if transformer TP 765 is *not* an exempt commodity under 49 C.F.R. § 1039.11, it is possible that § 10709, rather than the Carmack Amendment, governs the shipping contract.

Siemens Transformadores S.A. de C.V. v. Soo Line R. Co., No. 10 C 3750, 2012 WL 1938848, 2

(N.D. Ill. May 29, 2012) (internal citations omitted).  See also Babcock & Wilcox Co. v. Kansas

City Southern Ry. Co., 557 F.3d 134, 141-42 (3d Cir. 2009) (considering § 10709 contract

independently because there was no issue of the interplay between §§ 10502, 11706, and 10709

as there was in Schoenmann).

At no point have the parties argued that the shipment was subject to exemption under §

10502, so the court is correct to limits evaluation to the sole question of whether a section 10709

contract was formed.  Therefore, the Court concludes that if a section 10709 contract was formed

between KCSR and HLI, it is not subject to the Carmack Amendment.  But for the reasons

discussed below, this Court finds that KCSR has not met its burden on summary judgment that

the BOLs formed a section 10709 contract that is outside the reach of the Carmack Amendment.

2.  Identifying a Section 10709 Contract

How one identifies a § 10709 contract is not exactly clear.  Sompo II, 540 F. Supp. 2d at

495 ("Courts have . . . noted that there is little guidance on how to identify a § 10709 contract.")

(collecting cases); Babcock, 557 F.3d at 146 ("We note the difficulties faced by the district

courts in the absence of a simple statutory or regulatory test for identifying a § 10709 contract.")

(noting that courts either "presume the existence of a common carriage agreement in the absence

of compelling evidence indicating otherwise" or "presume the existence of a § 10709 contract.").

Even the STB has acknowledged the difficulty of identifying a § 10709 contract. See Sompo II,

14

540 F. Supp. 2d at 494-95 (discussing STB's concern that "there is no clear distinction in the statute or our precedent between a contract and a common carrier rate").

Previously, the regulation implementing Section 10709 required contracts made pursuant to 49 U.S.C. § 10713 (the predecessor to § 10709) and "entered into by one or more rail carriers and one or more purchasers of rail service, to provide specified services under specified rates, charges and conditions" to "specify that the contract is made pursuant to" the statute. See 51 Fed. Reg. 45898 (Dec. 23, 1986). The current version, however, does not specifically require that Section 10709 contracts identify themselves as such on their face.

Although a Section 10709 contract is no longer required to be explicitly identified as such, courts in this district have been hesitant to assume the existence of a Section 10709 contract "[a]bsent (1) a statement as to the statutory authorization for the contracts on their face or (2) evidence of such an understanding between the parties [ ] because (3) the previous regulations required this statement, (4) the current regulations do not affirmatively exempt this statement, and (5) the STB has noted confusion on this issue." Sompo II, 540 F. Supp. 2d at 497-98 (finding that no reasonable factfinder could find that section 10709 contracts had been formed and thus defendants' failure to make an initial offer of full Carmack liability negated any stated limitations on liability).[11]

---

[11] One district court has gone further to contend that "while it is true that Carmack protections do not apply to 49 U.S.C. § 10709 contracts, the existence of such a contract presupposes that the shipper turned down Carmack terms." Tamini Transformatori S.R.L. v. Union Pacific Railroad, 02 Civ. 129(AGS), 2003 WL 135722, at *7 (S.D.N.Y. Jan. 16, 2003). Other than Tamini, however, courts have been hesitant to conclude that a Section 10709 contract must first offer Carmack terms based on straightforward contract principles and the statutory language that § 10709 contracts are not subject to the Carmack Amendment. E.g., Sompo II, 540 F. Supp. 2d at 498 ("As a preliminary matter, I agree with the numerous courts that have held that § 10709 contracts are not, standing alone, required to initially offer full Carmack liability for a contractual limitation on liability to be effective. The plain language of the statute--that these contracts may

15

Judge Chin later clarified that not specifically indicating a contract as a § 10709 contract was not the dispositive issue. Rather, "in addition to the absence of such a reference, [he] relied also on the absence of any indication that there was a meeting of the minds that § 10709 applied." Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co., 553 F. Supp. 2d 348, 351 (S.D.N.Y. 2008) (denying motion for reconsideration). In other words, the primary determination for the existence of Section 10709 is whether there is *any* evidence of intent to enter such a contract. See Great American Ins. Co. v. USF Holland Inc., 937 F. Supp. 2d 376, 388 (S.D.N.Y. 2013) ("The well-accepted rule is that a valid contract requires proof of an offer, acceptance, consideration, mutual assent, and the intent to be bound.") (citing Oscar Productions, Inc. v. Zacharius, 893 F. Supp. 250, 255 (S.D.N.Y. 1995)).

Even Babcock, which KCSR cites with gusto, required indications that evinced the intent of the parties to enter a § 10709 contract. For example, Babcock noted departure from the prescriptions of 49 U.S.C. § 11101: whereas the statute required that a carrier provide service upon reasonable request and make rates available public upon request, the agreement was a "confidential railroad transportation contract" applicable only to specific cargo. See Babcock, 557 F.3d at 144-45. Further, the parties' agreement required a longer notification period for cancellation of the service terms (30 days) than that prescribed in 49 U.S.C. § 11101(c) (20 days); limited liability to $25,000 per vessel; and required a minimum weight of 179,000 pounds. Id. However, Babcock did not reach this instance where the carrier seeking to limit liability, on

---

'provide specified services under specified rates and conditions' with 'no duty in connection with services provided under such contract other than those duties specified by the terms of the contract'--makes this clear."). As discussed above, the conclusion in Tamini is likely the result of the interplay between Section 10709 and 10502, the latter of which is not at issue here. See supra at 12-13.

one hand, contends that it has complied with the mandates of the Carmack Amendment to offer full coverage and, on the other hand, claims that it need not do so. Id. at 147 (declining to decide "the proper default rule to apply in the case of ambiguous provisions").

The numerous departures from the requirements of a Carmack contract satisfied the Babcock court of the parties' intent to enter a section 10709 contract. Here, the differences are not as stark. For example, the Price Quote requires the same 20 days for cancellation as 49 U.S.C. § 11101. Furthermore, the Rules Publication which KCSR contends was incorporated into the Price Quote, describes the opportunity for full Carmack liability protection.

On this point, KCSR cites two cases, ACE USA v. Union Pacific R. Co., Inc., NO. CIV.A. 09-2194-KHV, 2011 WL 3610103 (D. Kan. Aug 15, 2011) and Dow Chemical Co. v. Union Pacific Corp., 8 F. Supp. 2d 940 (S.D. Tex. 1998), where the carrier incorporated the Carmack Amendment into their respective § 10709 contracts. (Dkt. No. 93, KCSR Mem. for Partial Summary Judgment, at 7-8). But the contracts in ACE USA and Dow Chemical can be easily distinguished from the Price Quote and BOLs here.

In ACE USA, "the title of UP–C–35322 is 'RAIL TRANSPORTATION CONTRACT PURSUANT TO 49 U.S.C. SECTION 10709,'" which "clearly indicate[d] the parties' intent to be governed by a private contract and not the Carmack Amendment." ACE USA, 2011 WL 3610103, at *4. Furthermore, incorporation of the Carmack Amendment was expressly limited to how "claims shall be processed" and did not extend to Carmack's liability provisions. Id. ("The regulations to which the provision refers—49 C.F.R. Part 1005—refer exclusively to claims processing, and not liability."); see id. at *4 n.8. Likewise, in Dow Chemical, the defendant railroad did not dispute that the contracts at issue were entered under the auspices of § 10709. The contracts limited liability, but incorporated the Carmack Amendment and 49 C.F.R.

Part 1005 as to how claims should be processed "in all other respects." <u>Dow Chemical</u>, 8 F. Supp. 2d at 941.

On the contrary, the Rules Publication does not so neatly compartmentalize the effect of the Carmack Amendment.  Instead, the Rules Publication discusses the applicability of the Carmack in its totality, including as relevant here, its liability provisions.  (<u>See</u> Rules Publication, at Item 80) ("On domestic moves that originate in the United States of America, *shipper may, at their option, select freight loss and damage liability provisions set forth in 49 U.S.C.A., Section 11706 (Carmack) as explained in this item.  If 49 U.S.C.A. Section (Carmack) is not selected, the liability provision of this item will govern.*") (emphasis added)).

KCSR has failed to establish the intent of parties to enter a § 10709 contract.  With the purported offer of Carmack liability protection in the Rules Publication, the minimal variations from a standard Carmack contract and the lack of an explicit representation that this was a § 10709 contract, there is simply no basis for concluding that the BOLs formed a § 10709 contract that would not be subject to the Carmack Amendment.  <u>See</u> <u>Sompo II</u>, 540 F. Supp. 2d at 497-98.

B.  Whether Shipment Originated in Mexico

HLI contends that the Carmack Amendment does not apply because the "shipment originated in Mexico" and is thereby ostensibly excluded from full Carmack liability protection under the Rules Publication.  (<u>See</u> Rules Publication, Item 80, "Claims").  This argument is not only disingenuous given HLI's primary argument that it was not aware of the Rules Publication until after the derailment; it is also wrong.

The recent Supreme Court decision in <u>Regal-Beloit</u>, 130 S.Ct. 2433, holding that the Carmack Amendment does not apply to the inland rail segment of a shipment originating overseas under a single through bill of lading, presented a different fact pattern.  There, the

18

carriers were responsible for transport on a through bill of lading from China to inland United States destinations.  Thus, Regal-Beloit did not reach the present situation where "the bills of lading for the overseas transport ended at this country's ports and the cargo owners then contracted with [another carrier] to complete a new journey to an inland destination in the United States." Regal-Beloit, 130 S.Ct. at 2445.  Indeed, Regal-Beloit expressly left the ruling in Reider v. Thompson, 339 U.S. 113, 70 S.Ct. 499 (1950) intact.  Id. at 2443-44.

In Reider, the Supreme Court held that the Carmack Amendment was applicable to a shipment that departed from Argentina where the receiving carrier became responsible for the cargo within the United States on an original bill of lading.  Reider considered it a matter of contract to organize discrete portions of a trip, but that decision once made, put the domestic leg of the transport within the purview of the Carmack Amendment:

> The test is not where the shipment originated, but where the obligation of the carrier as receiving carrier originated.  Thus, it is not significant that the shipment in this case originated in a foreign country, since the foreign portion of the journey terminated at the border of the United States. The obligation as receiving carrier originated when respondent issued its original through bill of lading at New Orleans. That contract of carriage was squarely within the provisions of the statute [Carmack Amendment].

Reider, 339 U.S. at 117, 70 S.Ct. 499 (internal citations omitted).

Reider leads to the conclusion that "[w]here a shipment involves transportation in a foreign country, the domestic leg of the journey will be subject to the Carmack Amendment as long as the domestic leg is covered by a separate bill or bills of ladings."[12] New York Marine &

---

[12] The additional conclusion in S/S Ming Prosperity that "[t]he [Carmack] Amendment, however, does not apply where a through bill of lading covers the entire course of an international journey," 920 F. Supp. at 425, was validated in Regal-Beloit.

General Ins. Co. v. S/S Ming Prosperity, 920 F. Supp. 416, 425 (S.D.N.Y. 1996) (quoting Swift

Textiles v. Watkins Motor Lines Inc., 799 F.2d 697, 701 (11th Cir. 1986)).

This is the precise situation presented to this Court. The parties do not dispute that there

were two separate segments of the trip: the first segment from Apodaca, Nuevo Leon, Mexico to

Nuevo Laredo, Mexico (at the U.S.-Mexico border) and the second segment from Laredo, Texas

to Port Arthur, Texas. (HLI Rule 56.1 Stmt. ¶ 5). Neither do the parties dispute that the bill of

lading for the US segment of the trip indicated the origin city as Laredo, Texas and the

destination city as Port Arthur, Texas. (HLI Rule 56.1 Stmt. ¶ 9; Formanek Decl. Ex. 7). Given

these admissions, HLI cannot successfully contend that the shipment originated in Mexico, at

least not as required to avoid the effect of the Carmack Amendment.

C. Intrastate Rail Transportation is Within the Purview of the Carmack Amendment

HLI next objects to the applicability of the Carmack Amendment because the domestic

transport was an intrastate shipment from Laredo to Port Arthur, two cities within the state of

Texas. Analysis under the Carmack Amendment as well as general principles of interstate

commerce require the conclusion that the Carmack Amendment is applicable even to intrastate

rail transportation.

The Carmack Amendment requires that "[a] rail carrier providing transportation or

service subject to the jurisdiction of the [Surface Transportation Board ("STB")] under this part. .

. issue a receipt or bill of lading for property it receives for transportation under this part." 49

U.S.C. § 11706(a). "That rail carrier and any other carrier that delivers the property and is

providing transportation or service subject to the jurisdiction of the STB under this part are liable

to the person entitled to recover under the receipt or bill of lading." Id.

The STB has jurisdiction over transportation by rail carrier that is (1) only by railroad or (2) by railroad and water when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.  49 U.S.C. § 10501.  This jurisdiction extends to transportation in the United States, including "between a State and a place in the same or another State as part of the interstate rail network."  49 U.S.C. § 10501(2)(A).

The jurisdictional reach of the Carmack Amendment is not necessarily coextensive with the jurisdiction of its enforcing agency—the Surface Transportation Board ("STB").  Regal-Beloit, 130 S. Ct. at 2445.  Rather, "Carmack applies only to shipments for which Carmack requires a bill of lading[,] that is to say, to shipments that start with a carrier that is both subject to the STB's jurisdiction and receives the property for domestic rail transportation."  Id. (internal quotation marks and alteration marks omitted); Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 144 (2d Cir. 2010).  "Carmack thus requires the receiving rail carrier—but not the delivering or connecting rail carrier—to issue a bill of lading."  Regal-Beloit, 130 S. Ct. at 2443; Mitsui Sumitomo Ins. Co., Ltd. v. Evergreen Marine Corp., 621 F.3d 215, 219 n. 4 (2d Cir.2010) (under Regal-Beloit, "the pertinent question is whether the carrier functioned as a receiving rail carrier").  A receiving rail carrier is the initial carrier, which "receives" the property for domestic rail transportation at the journey's point of origin.  Regal-Beloit, 130 S. Ct. at 2443.

The transport at issue here took place only by railroad so the Carmack Amendment applies to the extent KCSR was the receiving carrier and was subject to the STB's jurisdiction.  There is no question that KCSR is a "rail carrier" that is "subject to the jurisdiction of the [STB]" for its operations in the United States.  49 U.S.C. § 11706(a).  Furthermore, there is no dispute that according to the BOLs, KCSR received the cargo for domestic transport at the origin city of

Laredo, Texas.  KCSR "'receiv[ed]' the property 'for transportation under this part,' where 'this part' is the STB's jurisdiction over domestic rail transport." Regal-Beloit, 130 S. Ct. at 2442–43. In this case, the transport by rail from Laredo, Texas to Port Arthur, Texas is, by definition, transportation under the STB's jurisdiction because it is transportation "between a State and a place in the same. . . State as part of the interstate network."  49 U.S.C. § 10501(2)(A).  Thus, the Carmack Amendment applies.

If the plain language of the statute were not enough, HLI's contention is still unsuccessful because "Congress's authority to regulate even intrastate aspects of the operation of railroads is beyond question." CSX Transp., Inc. v. Ga. Public Service Com'n, 944 F. Supp. 1573, 1585–86 (N.D. Ga. 1996) (collecting cases).  Congress's regulation of intrastate railroad agencies and tracks under the ICC Termination Act of 1995 is 'part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated.'" Id. at 1586 (quoting U.S. v. Lopez, 514 U.S. 549, 561, 115 S.Ct. 1624, 1631 (1995)) (preemption of state regulatory authority over intrastate tracks and agencies a valid exercise of Congress's power under the Commerce Clause).

This congressional ability to regulate commerce gave rise to STB's jurisdiction over intrastate commerce. See, e.g., Cedarapids, Inc. v. Chicago, Central & Pacific R. Co., 265 F. Supp. 2d 1005, 1012-13 (N.D. Iowa 2003) ("Whereas Congress explicitly excluded wholly intrastate spur and side tracks from federal jurisdiction in the Staggers Rail Act, the predecessor to the ICCTA, Congress explicitly included such tracks within the exclusive jurisdiction of the STB under the ICCTA.").  That "railroads are instrumentalities of interstate commerce over which Congress's authority to regulate even purely intrastate matters under the Commerce

22

Clause has not been and cannot be doubted." Ga. Public Service Com'n, 944 F. Supp. at 1586. HLI's effort to disturb such a fundamental principle is a failed one.

## II. Effective Limitation of Liability

Having decided that this is not a Section 10709 contract and that the Carmack Amendment applies to this shipment, the next determination is whether KCSR effectively limited its liability to $25,000 per car, in light of the Carmack Amendment's presumption of the carrier's responsibility for full liability. HLI concedes knowledge of the limitation of liability, but contends that it was never offered the opportunity to acquire full coverage Carmack protection. KCSR argues that it has discharged its responsibility to offer full value coverage by incorporating the Rules Publication into the Price Quote and thus into the shipping contract—the BOLs. The linchpin of KCSR's argument, of course, is that the Rules Publication offered full Carmack protection and described the procedure necessary to invoke such protection.

At common law, contractual provisions that purport to relieve carriers from liability for loss or damage to cargo altogether are invalid and unenforceable as against public policy. Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53, 59 (2d Cir. 2000) (citing Adams Express Co. v. Croninger, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314 (1913)); Shippers Nat'l Freight Claim Council, Inc. v. ICC, 712 F.2d 740, 746 (2d Cir. 1983); Ingram Micro, Inc. v. Airoute Cargo Express, Inc., 154 F. Supp. 2d 834, 842 (S.D.N.Y. 2001). Put another way, Carmack liability "is rooted in strict liability." Sompo I, 456 F.3d at 76; see also Rankin v. Allstate Ins. Co., 336 F.3d 8, 9 (1st Cir. 2003) (holding that Carmack "imposes something close to strict liability upon originating and delivering carriers"); ABB Inc. v. CSX Transp., Inc., 721 F.3d 135, 142 (4th Cir. 2013) ("The plain language of the statute provides that

23

in the absence of a clear, written agreement by the shipper, the carrier is subject to full liability for actual losses.") (citing 49 U.S.C. § 11706).[13]

Although Carmack intends to create a uniform system of carrier liability within the United States and thus "constrains carriers' ability to limit liability by contract," Regal-Beloit, 130 S.Ct. at 2441, there is an exception to this general rule, which allows a carrier to limit its liability "to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier." 49 U.S.C. § 11706(c)(3)(A).

"[T]o ensure that the exception does not swallow the rule, a carrier [is] required to offer at least two liability options in order to ensure that the shipper's agreement was well informed and deliberate." Emerson Elec. Supply Co. v. Estes Express Lines Corp., 324 F. Supp. 2d 713, 728 (W.D. Pa. 2004) (citing Nothnagle, 346 U.S. at 135-136, 73 S.Ct. 986); Caten v. Salt City Movers & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945) ("Only by giving the shipper an opportunity to choose between higher and lower rates based upon valuation can the carrier place the shipper who has selected a lower rate in the prescribed manner in the position where he is estopped to assert loss or damage to an amount in excess of the declared valuation upon which the rate was fixed."); see also Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc., 572 F. Supp. 2d 379 (S.D.N.Y. 2008).

_____

[13] Although some of the cited cases consider the liability of air carriers and thus are not entirely on point as air carriers are not governed by the Carmack Amendment, see Feldman v. United Parcel Service, Inc., NO. 06 CIV. 2490 (MHD), 2008 WL 800989, at *6 n.3 (S.D.N.Y. Mar. 24, 2008), the requirement of fair opportunity in the released value doctrine under federal common law is the same as reasonable opportunity under the Carmack Amendment, Kemper Ins. Co. v. Fed. Express Corp., 252 F.3d 509, 514 (1st Cir. 2001) ("[W]ith respect to the fair opportunity to declare a higher rate, the constraints on limitation clauses are the same for motor [and rail] carriers covered by the Carmack Amendment as they are for air carriers covered by the released value doctrine.")

These principles have led courts to reason that for a carrier to effectively limit its liability under the Carmack Amendment, it must "(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment." Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987). The Hughes test has been altered by subsequent statutory developments, but only as to the first prong, now that tariffs need only be filed with the STB in certain limited circumstances. MidAmerican Energy Co. v. Start Enterprises, Inc., 534 F. Supp. 2d 930, 935 (S.D. Iowa 2008); Gulf Rice Arkansas, LLC v. Union Pacific Railroad Co. 376 F. Supp. 2d 715, 721 (S.D. Tex. 2005) ("The first requirement of the four part test has been modified, as the ICC Termination Act of 1995. . . abolished the Interstate Commerce Commission, (and the mechanism for filing tariffs) and replaced that Commission with the Surface Transportation Board.").

As relevant here, the requirement to provide a reasonable opportunity to choose between levels of liability has survived statutory amendment. Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 186-87 (3d Cir. 2006) ("[A] carrier must continue to offer two or more rates with corresponding levels of liability in order to successfully limit its liability pursuant to the Carmack Amendment."); Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 842 (11th Cir. 2003) ("Notwithstanding the amendments to the Carmack Amendment, a carrier wishing to limit its liability is still required to give the shipper a reasonable opportunity to choose between different levels of liability.").

The requirement has long recognized that "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or

lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 135, 73 S.Ct. 986, 990 (1953); ABB Inc., 721 F.3d at 142 ("Without a rule requiring at least some specificity in a written agreement, the shipper would not have a reasonable opportunity to choose between two or more levels of liability, but instead would be automatically and unwittingly subject to the carrier's unilateral choice of a rate authority.") (internal quotation marks and citations omitted); Nippon Fire & Marine Ins. Co. v. M/V Tourcoing, 979 F. Supp. 206, 209 (S.D.N.Y. 1997) ("If the carrier does not provide such a fair opportunity, it is not entitled to the benefit of any limitation of liability that might otherwise apply."); see Tamini, 2003 WL 135722, at *6 (released value limitations binding "only if the shipper has notice of the rate structure and is given a full and fair opportunity to obtain greater protection") (citing Co-Operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Ry. Co., 840 F.2d 447, 451 (7th Cir. 1988)).

Although the fair opportunity doctrine has come under scrutiny as "tak[ing] on a life of its own," see Hollingsworth & Vose Co. v. A-P-A Transp. Corp., 158 F.3d 617, 620 (1st Cir. 1998), even courts keeping it on a short leash, require that "the tariff [make] both coverages available, the bill of lading afford[] the shipper a reasonable opportunity to choose between them ... and the shipper [is] a substantial commercial enterprise capable of understanding the agreements it signed." Id. at 621.

Even with this lower bar, it cannot be said as a matter of law that KCSR offered a higher level of coverage. In Hollingsworth, there was a pre-published tariff with the relevant rate information for higher and lower levels of coverage and the bill of lading included a blank for the shipper to declare the value of the cargo. Therefore, the shipper could rightly be charged with knowledge of the tariff because it had access to the tariff and could declare the cargo's

26

value.

Here, it cannot be said unequivocally that HLI had knew how to locate the Rules

Publication or had an opportunity to state the actual value of the cargo on the bill of lading.

Where the bill of lading or other relevant document does not contain a declared value box, an

attempted liability limitation contained in the carrier's tariff is not effective because the carrier

has not given the shipper a reasonable opportunity to choose a higher level of liability. See Sassy

Doll, 331 F.3d at 842-43.  In such an instance, "there is no unilateral mistake on the part of the

shipper; instead, there is the absence of a reasonable opportunity for the shipper to choose

different levels of coverage." Id. (citing Rohner Gehrig Co., Inc. v. Tri-State Motor Transit, 950

F.2d 1079, 1084 (5th Cir. 1992)); see also Emerson Elec. Supply Co. v. Estes Express Lines

Corp., 324 F. Supp. 2d 713, 729 (W.D. Pa. 2004) (no fair opportunity because plaintiff was

neither given a choice of paying a higher price to ship uncrated equipment or given an

opportunity to choose higher level of liability coverage).

Finally, a shipper does not have a reasonable opportunity to choose between two rates

and levels of liability when it is only presented with one rate in exchange for limited liability and

a black box by way of an undisclosed rate for full coverage. See Fruitco Corp. v. Consolidated

Rail Corp., 118 Misc.2d 1090, 1094, 462 N.Y.S.2d 754 (N.Y.City Civ.Ct.,1983) ("The failure to

offer terms consistent with Carmack made the  [alternative] terms [permitted pursuant to the

exemptions provision of Carmack] of the "trip slip" an alternative to nothing.").  The effect is

the same even if KCSR were "willing to provide terms consistent with Carmack" as "[t]he

statute imposes upon carriers something more than a passive, uncommunicated willingness to

provide full liability terms consistent with Carmack; it mandates that the carrier actually provide

those terms." Id.

27

KCSR attempts to cloud the issue by pointing to HLI's sophistication as a shipper. Although sophistication is possibly relevant to the issue of constructive knowledge, discussed infra, "[t]he subjective qualities of the shipper. . . simply have no bearing on substantial compliance of the carrier's B.O.L. with its tariffs nor with the second and third prongs of the Hughes test." Rohner Gehrig Co, 950 F.2d at 1084; Camar Corp. v. Preston Trucking Co., Inc., 221 F.3d 271, 276 n.5 (1st Cir. 2000); Mechanical Technology Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1090 (2d Cir. 1985) (Winter, J., concurring) ("[T]he shipper's sophistication is relevant only to whether it ought to have known of the provisions of the tariff.").

Even as a sophisticated shipper, there is no evidence that HLI "ought to have known of the provisions of the tariff." Mech. Tech., 776 F.2d at 1090 (concurring opinion). The fact that Raul Ortega, an HLI employee, previously worked as a Customer Service Agent for the Mexican affiliate of KCSR ["KCSM"] for 18 months, (see Declaration of Raul Ortega ("Ortega Decl.") ¶ 5), does not mean that knowledge of the Rules Publication can be imputed to him. See Gemnet Exp., Inc. v. Federal Exp. Corp., No. 06 Civ. 2648(DF), 2009 WL 928299, at *6 & n.4 (S.D.N.Y. March 30, 2009) (declining to conclude that the shipper's owner should be deemed to have constructive notice of insurance because of his previous employment in the shipping business where he was only a sales representative and never reviewed any FedEx contracts or spoke with any FedEx representatives). Here, Ortega claims that he had no knowledge of or exposure to KCSR Rules Publications including, but not limited to, the Rules Publication "as it had nothing to do with [his] job responsibilities at KCSM." (Ortega Decl. ¶ 5).

Even if this Court accepts the contention that the Rules Publication was incorporated into the BOLs, it is undisputed that HLI did not receive a copy of the Rules Publication until after the derailment so there was no actual notice. It is also undisputed that KCSR did not provide a

28

dollar amount for full liability coverage or have one at the ready in the event HLI decided to request full value coverage.  (KCSR Response to HLI/FMMC's 56.1 Stmt. ¶ 42, Dkt. No. 136) (not contesting that "[a]ccording to Steven Sigler of KCSR, the reason why a quote is not given to a customer for full value liability at the time a quote is requested is because it would be a lot of work for KCSR to provide such quotation(s).").  Instead, to obtain Carmack coverage, the shipper, among other requirements, would be expected to notify the rail carrier at least 72 hours before the rail car was released and prepay an as-yet undetermined Carmack liability rate. (See Rules Publication, Item 80).

That HLI was only ever presented with one rate—which included the limitation of liability—necessarily means that it was not given the opportunity to choose between a higher and lower rate for varying levels of liability and that KCSR did not effectively limit its liability under the Carmack Amendment.  While the result may be harsh to carriers like KCSR, "it is of some consequence to note that the general rule under the Carmack Amendment has always been that a carrier is liable for the actual value of the lost or damaged property."  Emerson, 324 F. Supp. 2d at 727-28; Caten, 149 F.2d at 432 ("The statute makes it abundantly clear that the carrier's common law liability for full actual damages, whether or not caused by its negligence, is imposed when it accepts goods for carriage, unless a certain specified agreement limiting that liability has been made as the result of an equally certain specified action by the shipper in respect to a voluntary valuation of his goods.")

III. Constructive Notice

The Second Circuit recognized the doctrine of constructive acceptance in Mechanical Technology Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085 (2d Cir. 1985).  There, the court held that because "shippers are charged with notice of terms, conditions, and regulations contained in

the tariff schedule," 776 F.2d at 1087, a shipper can be held to have constructive knowledge of and assent to the terms of a tariff where the shipping contract "was negotiated between people of at least equal economic stature and commercial awareness or acuity," id. at 1088 (internal citations and quotation marks omitted).

But Mechanical Technology "did not abrogate the requirement that the shipper agree to the limitation of liability." Asset Management & Control, Inc. v. ABF Freight System, Inc., 18 F.Supp.2d 187, 192 (N.D.N.Y. 1998); Mech. Tech., 776 F.2d at 1088 ("[W]e caution that our holding should not be taken as a retreat from the historic presumption that shippers are able to recover for damaged goods. The existence of a tariff is not in itself sufficient to limit liability."). Instead, the presumption of agreement can be made where certain conditions were met. See Mech. Tech., 776 F.2d at 1087-89.

Constructive acceptance, then, is ultimately a fact-specific determination. Mech. Tech.,776 F.2d at 1089 ("When a sophisticated shipper, using his own bill of lading form, leaves blank the space provided for declaring the released value of the goods, we will presume that he did so deliberately with full knowledge of the consequences under the applicable tariff."); Shapiro v. Prime Moving & Storage, Inc., No. 05-CV-5114(NGG)(MDG), 2007 WL 2572116, at *7 (E.D.N.Y. Aug. 31, 2007) (". . . Mechanical Technology was a fact-specific decision that did not set forth a bright-line rule that the shipper has a reasonable opportunity to purchase a higher level of coverage whenever the tariff specifies multiple levels of coverage.") (citations omitted); Schweitzer Aircraft Corp. v. Landstar Ranger, Inc., 114 F. Supp. 2d 199, 203 (W.D.N.Y. 2000) ("[In Mechanical Technology,] [a]s here, the shipper used its own form bill of lading. As here, the shipper's form allowed the shipper to declare a value of the property and thus, opt out of the limited liability tariff.  As here, the shipper released the goods to the carrier pursuant to the bill

30

of lading but left blank the space for declared value. *Under these facts*, the Second Circuit held that [the carrier] had successfully limited its liability. . .") (emphasis added); Novelty Textile Mills, Inc. v. C.T. Eastern, Inc., 743 F. Supp. 212, 217 (S.D.N.Y. Jul 18, 1990) (noting the "specific facts" of Mechanical Technology).

On the one hand, KCSR does submit strong evidence that HLI is a sophisticated shipper. HLI's website touts 100 years of combined experience among its employees despite only being in operation since 2009. (Formanek Decl. Ex. 1). The website also includes numerous "Job Chronicles" for similar shipments—the transport and rigging of transformers throughout the United States. (Id.) Moreover, HLI's Service Proposal for GE Prolec specifically averred that HLI "specializes in the transportation of oversize and overweight cargo throughout the USA, Canada and Mexico." (Formanek Decl. Ex. 2, at 9).

On the other hand, in every other respect this case is distinguishable. For one, it cannot be said unequivocally that HLI drafted the bill of lading or that that they were ever offered an opportunity to declare a full value. Although HLI inputted information into an online "fillable" bill of lading format, this form was located on KCSR's website. See Sassy Doll, 331 F.3d at 839-40 (concluding that a shipper "prepares" or "drafts" the bill of lading when "the shipper actually creates the bill of lading, not when it merely fills in the blanks on one the carrier has created").[14] It is also unclear whether this online bill of lading—the scope of which was constrained by KCSR—even allowed HLI the opportunity to declare a full value for the

---

[14] This Court is not convinced that Siren, Inc. v. Estes Express Lines, 249 F.3d 1268 (11th Cir. 2001), on which KCSR relies heavily, applies as much of Siren was spent focused on the fact that the shipper drafted the bill of lading. Even Siren distinguished cases where "it was the carrier which had drafted the bill of lading and all the shipper had done to the bill of lading was to fill in the blanks." Sassy Doll, 331 F.3d at 840 (citing Siren, 249 F.3d at 1271 n.4) (internal quotation marks omitted).

transformers.

On this record, KCSR has not established that HLI drafted or prepared the bill of lading, rather than just filling in the blanks, or established that at some point during the online process on KCSR's website, there was an opportunity to choose a higher level of protection (and price) rather than just accepting the Price Quote with its limitation of liability. These facts distinguish this case from Mechanical Technology and make summary judgment on a constructive notice theory inappropriate.

A.  Incorporation By Reference

A shipper may be charged with knowledge of general terms in a bill of lading that are incorporated by reference through other documents.  See, e.g., Ferrostaal v. Union Pacific Rail Co., 109 F. Supp. 2d 146, 150 (S.D.N.Y. 2000) (where shipper was offered, but declined the option of shipping its goods pursuant to the Carmack Amendment, the shorter limitations period applied because it was incorporated by reference in a document referred to in waybill). Similarly, in ABB Inc. v. CSX Transp., Inc., 721 F.3d 135, the Court recognized that "a decision in favor of [the carrier] would be required if Price List 4605 had been referenced specifically in the BOL, even if [the shipper] had not actually been aware of the limitation of liability contained in that price list. . . [as] the shipper reasonably would be charged with notice of the meaning of a precise, currently applicable term that the shipper included in the BOL."  721 F.3d at 143.

The facts here, however, merit a different outcome.  The purported offer of full Carmack protection was not found in the BOLs.  It was not even in the Price Quote.  Instead, KCSR contends that the full liability offer in the Rules Publication was incorporated by reference into the BOLs by virtue of a reference in the Price Quote that the "Price was subject to 9012" (Formanek Ex. 3).

In support of its argument, KCSR cites One Beacon Ins. Co. v. Crowley Marine Services, Inc., 648 F.3d 258 (5th Cir. 2011), for the principle that a shipper can be charged with knowledge of a defendant's website.  In One Beacon, a marine service agreement noted that it was "ISSUED IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW. CROWLEY. COM / DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING." 648 F.3d at 263.  The terms and conditions could not be accessed by typing "www.crowley.com/documents & forms" into a web browser and the One Beacon district court even acknowledged that the notation was not intended to be a web address indicating the exact location of the page.  Nevertheless, the district court was satisfied that the reference "provided directions to assist in locating the terms and conditions on Crowley's website" and found that the notice provision "plainly and conspicuously" incorporated the terms and conditions on Crowley's website, findings which the Fifth Circuit affirmed.  Id. at 264.

While One Beacon is topical, the present facts require a different conclusion.  KCSR's reference to the Rules Publication does not explain what it is or how it might be found.  In particular, KCSR never mentions its website—the sole source of the Rules Publication[15]—in the Price Quote or in the BOLs.  Instead, the only guidance to locate the Rules Publication on KCSR's website was within the document itself:  "This publication is available on the Internet for viewing or sending directly to your printer.  The KCS Home Page address is http://www.kcsouthern.com . From the Home Page choose the 'Customers" link, click 'Pricing

---

[15] Although a party could request a hard copy of the Rules Publication, the procedure for making such a request was explained within the Rules Publication itself.  (Rules Publication, at Item 5) ("If you are not equipped to obtain a copy of this publication from KCS' web site, a hard copy will be mailed to you, if you submit a formal written request to the following address. . .").

and Rules Publications' then click the 'Rules Publications 9012' link." (Rules Publication, at Item 5). Standing alone, it is unclear how a shipper would be expected to know the significance of "9012" to know to look there for the offer of full liability coverage required by the Carmack Amendment.

   B.   "9012" is Not a Widely Known Designation

   A shipper may be also charged with knowledge of industry terms that have become shorthand for variation from Carmack requirements. For example, in Siren v. Estes Express Lines, 249 F.3d 1268, (11th Cir. 2001), the shipper was charged with knowledge of the term "Class 85" "which is universally understood throughout the motor carrier industry to limit the liability of the carrier. . . irrespective of whether the shipper had actual knowledge of the limiting aspect of those terms." 249 F.3d at 1274. In Siren, the shipper had drafted the bill of lading and had used the term "Class 85" in its own bill of lading. But this case is a far cry from Siren where the Class 85 designation was "understood throughout the trucking industry to mean, among other things, that the carrier's liability would be limited." Siren, 249 F.3d at 1269.

   This case presents only a mysterious reference to "9012," which is an abbreviation for an internal KCSR document: KCS Rule Publications 9012. Internal, privately held price lists are held to more scrutiny than a publicly published tariff. ABB Inc., 721 F.3d at 144 ("[W]e decline to conclude that a shipper should be held to notice of a privately held price list based only on generic and ambiguous language referencing a "tariff" or "classification."). In this case, the Rules Publication was an internal publication, not an industry known standard and did not even identify itself as a tariff, which might have put HLI on notice of additional terms. Indeed, "9012" stands in strong contrast to UFC tariff 6000, which was denoted specifically as a limiting

tariff in the Price Quote.  (See Price Quote (Compare "Price subject to 9012" with "Price subject to UFC tariff 6000")).

For all of the reasons discussed, KCSR has failed to establish as a matter of law that it effectively limited its liability under the Carmack Amendment.  Therefore, KCSR's motion for partial summary judgment on limitation of liability is DENIED.

II

**HLI's Cross-Motion to Strike the Affirmative Defense of Limitation of Liability**

To the contrary, no reasonable jury could find that the Rules Publication was incorporated by reference into the BOLs, which is fatal to KCSR's claim even if it could find that HLI had a reasonable opportunity or could be deemed to have constructive knowledge of the Rules Publication (i.e., if there were a box to declare the actual value of the transformers).   It is telling that in the same March 16, 2010 email advising HLI of the limitation of liability, KCSRdid not refer to the Rules Publication simply as "9012," but referred to it in full as "KCS Rules Publication 9012." (Email from Steve Sigler to Raul Ortega, Sigler Decl. Ex. 2) ("You will note that the shipments were subject to terms of KCS Rules Publication 9012 and listed a specific limitation to liability of $25,000 per railcar.").  If "9012" were an unequivocal reference to the Rules Publication when HLI accepted the Price Quote, it is highly questionable that it would not be an equally satisfactory reference after the derailment.  HLI's motion to strike the affirmative defense of limitation of liability is GRANTED.

III

## Chartis's Cross-Motion for a *Prima Facie* Claim

I.   Chartis Does Not State a *Prima Facie* Claim Under the Carmack Amendment

Lastly, Chartis seeks to establish a *prima* facie claim under the Carmack Amendment.

"[I]n an action to recover from a carrier for damage to a shipment, the shipper establishes [its]

prima facie case when [it] shows delivery in good condition, arrival in damaged condition, and

the amount of damages." Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137-38, 84

S.Ct. 1142 (1964); Project Hope v. M/V IBN SINA, 250 F.3d 67, 73 n.6 (2d Cir. 2001).  Once

the prima facie case is established, liability attaches unless the carrier demonstrates that it was

not negligent and that one of the following exceptions applies:  (1) an act of God, (2) an act of

the public enemy, (3) an act of the shipper, (4) an act of the public authority or (5) the inherent

nature or vice of the goods." S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co., 695

F.2d 253, 256 (7th Cir. 1982) (citing Missouri Pac. R.R., 377 U.S. at 137-38, 84 S.Ct. 1142).

It is undisputed that the transformers arrived in damaged condition and Chartis has also

provided proof of its damages (Torres Decl. Ex. J), which KCSR does not dispute the amount of

damages.  Therefore, the only issue is whether Chartis has established delivery to KCSR in good

condition.  Generally, "[a] shipper's burden of proving that the goods were delivered to the

carrier in good condition may be satisfied by the proffer of a clean bill of lading for the

shipment." Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83-84

(2d Cir. 2004) (internal citations omitted); Great American Ins. Co. v. USF Holland Inc., 937 F.

Supp. 2d 376, 384 (S.D.N.Y. 2013).  Evidence of a clean bill of lading is only sufficient if "the

cargo was packaged in a way that permitted its inspection by the carrier." Security Ins., 391 F.3d

at 83.  "[W]here the contents of a shipment are not visible or open for inspection. . . a clean bill

of lading is not sufficient to establish delivery of the goods in good condition. Instead, when a carrier is prevented from independently inspecting cargo, the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo." Id.

There is no indication on the waybills or bills of lading (Torres Decl. Ex. D) that the cars or transformers themselves were sealed. Cf. Security Ins., 391 F.3d 77. Moreover, Chartis's motion represents that the transformers were "transported on a specialized railcar open and capable of inspection by [KCSR]". (Chartis Reply, Dkt. No. 153, at 16).

But even if the transformers were shipped in open railcars capable of inspection, the clean bill of lading rule is not dispositive of the transformers' pre-shipment condition. A clean bill of lading is necessarily limited to external inspection of the transformers. Clean on-board bills of lading of packaged goods, however, merely attest to the apparent good condition of the cargo based on external inspection. Where cargo damage may have resulted from a hidden defect, the burden is on the shipper to establish that the cargo was delivered in good condition. Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 353 n.5 (2d Cir. 1981); ETS Gustave Brunet, S.A. v. M.V. Nedlloyd Rosario, 929 F. Supp. 694, 700 (S.D.N.Y. 1996). Here, much of the alleged damage was to internal elements of the transformers and related primarily to their functionality. (See generally Torres Decl. Ex. I, at CSM00031-CSM00047). This technical analysis involves more than can be seen by the naked eye. Therefore, a clean bill of lading is not sufficient.

In this case, Chartis must provide additional evidence that it delivered the cargo in good condition. KCSR contends that Torres's representation that the transformers undergo extensive

quality and control and were received in good order and condition, (Torres Decl. ¶¶ 16-17),

proves little.

I would agree that, standing alone, the declaration is insufficient.[16]  However, Torres also

testified at his deposition to the rigorous quality testing that takes place before transformers are

released (Torres Dep. at 152-154).  Chartis also provides evidence that many metrics of the

transformers' functionality declined between the "before shipping" test and the "after event" test.

(See Torres Decl. Ex. I, at CSM00034-CSM00047).  Finally, Prolec's insurer conducted its

investigation into Prolec's claim for coverage and concluded that the derailment of the train

caused the damage to the transformers.  (Torres Decl. Ex. I, at CSM00047).  These indicators

provide circumstantial evidence that Prolec delivered the transformers in good condition.

Nevertheless, KCSR points to visible gaps in the chain of custody.  For instance,

although Prolec contends that the transformers were delivered in good, working condition and

avers to the quality control procedures, Torres admitted that he was not present when the

transformers were loaded onto the rail carrier and that there was perhaps a days-long window

between when the transformers were completely fabricated and when they were loaded onto the

---

[16] KCSR's focus on the argument that Chartis cannot establish when the transformers were damaged if the only representation is that the transformers were in good order and condition when they left Apodaca, Mexico, is misguided.  Indeed, the Carmack Amendment was intended to ease the burden on shippers of establishing the reason their cargo was lost.  49 U.S.C. § 11706(a); Reider v. Thompson, 339 U.S. 113, 119 (1950) (recognizing the Carmack Amendment's intention to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods"); Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc., No. 09 Civ. 2365(PGG), 2011 WL 671747, at *2 (S.D.N.Y. Feb. 18, 2011) ("[T]he Carmack Amendment gives a shipper the right to proceed against the initial carrier in a case where damage or loss occurred while the shipment was in the hands of a subsequent carrier.") (quoting Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co., 537 F.2d 648, 653 (2d Cir. 1976)).  To make a prima facie claim under the Carmack Amendment, the inquiry, then, is not at which point doing the transport the damage occurred, but whether the cargo was damaged after the shipper released it to the carrier.

railcars for shipment. (Torres Dep. at 41, 45-46). Furthermore, although the Prolec's insurer notes when the "after event" testing took place (May 24-30, 2010), (see Torres Decl. Ex. I, at CSM00026), there is no indication when the "before shipping" testing took place. This is not to say that KCSR's version of events is airtight, but viewing the facts in the light most favorable to the non-movant, it casts enough of a doubt that this issue should not be decided on summary judgment. Therefore, Chartis has not established a *prima facie* claim under the Carmack Amendment and its motion for summary judgment is accordingly denied.

II.   Whether Prolec is Bound by HLI's Limitation of Liability

Given my determination that KCSR did not effectively limit its liability, Chartis may find it less necessary to distance itself from HLI. Nevertheless, I will briefly address Chartis's argument that Prolec would not be bound by any limitation of liability agreed to by HLI. I find that Prolec cannot escape the effect of Norfolk Southern Railway Co. v. Kirby ("Kirby"), 543 U.S. 14, 125 S.Ct. 385 (2004), that "an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers. . ." 543 U.S. at 34, 125 S.Ct. at 399.

In Kirby, the Supreme Court held that "[w]hen an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." Id. at 33, 125 S.Ct. at 398. In doing so, it adopted a non-traditional theory of agency that "limited the assumption of an agency relationship between an intermediary and a shipper who contracts for the intermediary's services to a narrow circumstance: where an intermediary makes a contract for liability limitations with carriers downstream." Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co., 696 F.3d 647, 654 (7th Cir. 2012) (citing Kirby, 543 U.S. at 35, 125 S.Ct. at 399). "The idea is that if A engaged B to handle a shipment, among other things, A has delegated to B the choice between a lower price

39

with a strict limitation of liability and a higher price without one, when B engages the services of Carrier C." Id. Thus, under Kirby, Prolec as the cargo owner is presumed to have allowed HLI to act on its behalf in the limited capacity of entering contracts for shipping services.

Chartis attempts to distinguish its case from Kirby by aligning with a recent Seventh Circuit decision, Nipponkoa Ins. Co., Ltd. v. Atlas Van Lines, Inc., 687 F.3d 780, 784 (7th Cir. 2012). The Nipponkoa court expressed hesitation to apply Kirby on a motion for summary judgment because there were disputed issues of material fact as to the independence of the intermediary from the carrier. First, there was the fact that the shipment coordinator, through its affiliate, selected a carrier for a shipment, which as it turned out, was the affiliate's exclusive motor carrier. In addition, the putative intermediary's affiliate shared the same physical address and used the same motor carrier number as the carrier. Thus, Nipponkoa presented a situation where it was "impossible to conclude as a matter of law that [the putative intermediary] was the kind of intermediary the Supreme Court had in mind in Kirby." 687 F.3d at 785.

This case, however, is not nearly so extreme to conclude that HLI was somehow a double agent. The e-mails (Torres Decl. Ex. M) on which Chartis hangs its hat do not put HLI's actions outside the purview of Kirby. At all times, HLI was engaged in negotiations for transport on Prolec's behalf. For example, on November 10, 2009, Raul Ortega explained Prolec's proclivity to go with another carrier because "GE Prolec has trust on [sic] the [Union Pacific Railroad] special trains from Laredo, they have used them before in the past, in this case these units are urgent, and they don't want to try something they haven't used before." (Torres Decl. Ex. M, at HLI02709).

Three days later on November 13, 2009 (in an email Chartis notably omits), Ortega reports back to KCS:

"According to our meeting we hold [sic] yesterday at the KCSM office, it seems that there is a corridor with the KCS that will be able to compete in time and pricing with the preferred corridor for Prolec, that is Laredo – East St. Louis with the [Union Pacific Railroad]. . .

We would like to obtain or [sic] rule 11 pricing[17] to Kansas City, and if you are able to provide a better pricing than the one already provided, would be greatly appreciated.

GE Prolec is really looking for an alternative routing going East of the US, and we believe after meeting with the KCS operations team, that the corridor KCS-Kansas City-NS will be a viable option for Prolec."

(Glynn Decl. Ex. G, at HLI02797).

The fact that HLI could not unilaterally decide which carrier handled Prolec's cargo greatly diminishes the comparison to Nipponkoa. Indeed, according to the MOU, HLI was required to "obtain three rigging quotes per operation and coordinate final agreement as to who performs the work with Prolec." (Torres Decl. Ex. A, MOU § 4.2). The emails that Chartis presents establish, at best, that HLI and KCSR maintained an ongoing relationship, where KCSR sought out business and HLI, on behalf of its client, would consider KCSR as an alternative to Prolec's preferred carrier. Therefore, the Court sees no reason to stray from Kirby.

## CONCLUSION

For the reasons set forth above, KCSR's motion for partial summary judgment (Dkt. No. 92) is DENIED. HLI's cross-motion for partial summary judgment (Dkt. No. 123) is GRANTED. Chartis's cross-motion that it has set out a prima facie claim (Dkt. No. 116) is DENIED.

---

[17] "Rule 11" refers to the practice of each carrier separately billing for rail charges for a shipment that requires two railroads. See CSX FAQs, http://www.csx.com/index.cfm/customers/faqs/ (last visited Jan. 28, 2014); see also Union Pacific Intermodal Glossary, http://www.uprr.com/customers/intermodal/integlos.shtml#5 (last visited Jan. 28, 2014). It does not implicate necessarily a limitation of liability.

SO ORDERED.

Dated:        New York, New York
              March 13, 2014

                                   **ANDREW L. CARTER, JR.**
                                   United States District Judge