UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHARTIS SEGUROS MEXICO, S.A. de
C.V., as subrogee of PROLEC GE
INTERNATIONAL, S. de R.L., de C.V.,
      Plaintiff,

      - against -

HLI RAIL & RIGGING, LLC, FRESH
MEADOW MECHANICAL CORP., and KANSAS
CITY SOUTHERN RAILWAY COMPANY,
      Defendants.
------------------------------------------------------------X
HLI RAIL & RIGGING, LLC, FRESH
MEADOW MECHANICAL CORP.,
      Third-Party Plaintiffs,

      - against -

FIREMAN'S FUND INSURANCE COMPANY
and CITY UNDERWRITING AGENCY, INC.,
      Defendants.
------------------------------------------------------------X

11 Civ. 3238 (ALC)(GWG)

ORDER AND OPINION

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiff Chartis Seguros Mexico, S.A. de C.V. ("Chartis") filed its complaint as subrogee of Prolec GE, whose electrical transformers slated for sale to a customer were damaged during transit between Apodaca, Nuevo Leon, Mexico and Port Arthur, Texas via Laredo, Texas. It now brings separate motions for summary judgment and sanctions (Dkt. No. 191 and 206, respectively) against Defendants HLI Rail & Rigging ("HLI") and Fresh Meadow Mechanical Corporation ("FMMC," and together with HLI, "HLI/FMMC"). HLI files its own motion for summary judgment (Dkt. No. 192) that the remaining claims of Chartis's complaint be dismissed because the Carmack Amendment is inapplicable and Chartis cannot state a claim against HLI under state law.

1

For the reasons stated herein, Chartis's motion for summary judgment and its motion for sanctions are denied. HLI's motion for summary judgment is similarly denied.

BACKGROUND

On March 14, 2010, a train operated by Kansas City Southern Railway ("KCSR") derailed. The train was en route from Laredo, Texas to Port Arthur, Texas when it derailed near Benavides, Texas and damage occurred to at least two railcars, each containing an electric transformer owned by Prolec GE International ("Prolec"). The transformers were allegedly damaged beyond repair or use. The transformers were allegedly valued at $3,213,210.00, but deducting for salvage value, the total amount of Prolec's claim was $2,356,066.22. (Chartis Rule 56.1 Statement in Support of Motion for Summary Judgment as Against HLI Rail & Rigging ("Rule 56.1 Stmt") ¶ 16-18; Declaration of Alfonso Torres in Support of Chartis's Motion for Summary Judgment (Dkt. No. 198) ("Torres Decl."), Ex. I and J).

Chartis presents a Memorandum of Understanding ("MOU"), dated February 1, 2010, between Prolec and HLI by which the parties agreed "on the operation alignments of the provision of transportation services" and HLI essentially acted as a logistics coordinator. (Torres Decl. Ex. A). By the MOU, HLI committed on its behalf or on behalf of "any of its subcontractors" to, among other duties: "Coordinate in the factory the requirement of Prolec leased rail cars and the collection of these when they are ready to be shipped"; "Provide in factory coordination between Prolec and HLI operations"; "Give daily follow up to the shipments that are in transit to destination"; "Follow up of the delivery unit until it arrives at its final destiny [sic]"; and "Expedite at Laredo and destination (if HLI is required to offload to the transformer and deliver to pad)." (MOU § 3.2.1). In addition, as relevant here, in the MOU, HLI agreed to insurance requirements that "HLI will maintain at it's [sic] own expense:

$1mil[lion] [general liability] insurance coverage; $1mil[lion] Cargo insurance; [and] $1mil[lion] Bond." (MOU § 5.0).

For these responsibilities, the parties agreed to "Payment Parameters" depending on the extent of HLI's involvement in the delivery: for rail only shipments, "HLI will be reimbursed at tariff rail rates plus 10% plus a $4,000 per transformer management fee." (MOU § 4.1). For rail and rigging to pad, "HLI will be reimbursed at rail tariff and rigging costs plus 10%, plus $9,000 management fee. (MOU § 4.2).

Significantly, HLI challenges whether the MOU was entered before the derailment and contends instead that the MOU was signed <u>after</u> the derailment on March 30, 2010 (Counterstatement to Rule 56.1 Stmt ¶¶ 77, 78; Declaration of Michael Scott ("Scott Decl.") ¶¶ 13-16 and Ex. A & B).

HLI was a named insured on a cargo insurance policy purchased by Fresh Meadow Mechanical Corporation ("FMMC"), an affiliate holding a minority interest in HLI. (Declaration of Michael F. Russo, dated August 14, 2013 ("Russo Decl.") ¶ 6; <u>see</u> Declaration of Ross McLaren, dated August 15, 2013 ("McLaren Decl.") ¶ 11)). After the derailment, the issuer of the cargo insurance policy, Fireman's Fund Insurance Company, denied HLI's claim for coverage on the ground that the policy excluded coverage for the property of others when the insured is acting as a carrier for hire or arranger of transportation. This lawsuit and series of motions ensued.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

3

of law." Fed. R. Civ. P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd., 696 F. Supp. 897, 900 (S.D.N.Y. 1988).

The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact and all inferences and ambiguities are to be resolved in favor of the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002). Once the moving party meets its burden of showing the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

I. Chartis's Motion for Summary Judgment (Dkt. No. 191)

Chartis seeks summary judgment on its claims that (1) HLI is a freight forwarder and thus liable to Chartis for the actual damages pursuant to the Carmack Amendment; (2) that HLI breached an agreement to procure insurance and is thus liable for damages and (3) that FMMC is an alter ego of HLI, and thus is equally liable for damages occurring from these breaches.

Chartis separately seeks attorney's fees as a sanction because HLI's defense to liability has allegedly been made in bad faith.

Under the relevant section of the Carmack Amendment, a carrier is liable for "the actual loss or injury to the property" for damage caused during the transportation. 49 U.S.C. § 14706(a)(1). Carmack thus permits a shipper to recover for the actual damage or loss from either the delivering carrier, the receiving rail carrier or "another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading" regardless of which carrier caused the damage. Id. This provision applies to a carrier that is subject to the jurisdiction of the Surface Transportation Board ("STB") under subchapter I or III of chapter 135 or chapter 105, that is, "general jurisdiction" of motor carrier transportation, "general jurisdiction" of freight forwarder service or "general jurisdiction" of rail transportation. See 49 U.S.C. §§ 13501, 13531 and 10501.

A. Liability Against HLI as a Freight Forwarder is Not Available on Summary Judgment

Chartis argues forcefully that HLI is a "freight forwarder" within the meaning of the Carmack Amendment.[1] 49 U.S.C. § 13102(8). Freight forwarders are subject to liability under

---

[1] The term "freight forwarder" means a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business--

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

5

the Carmack Amendment "for the actual loss or injury to the property" pursuant to 49 U.S.C. § 14706.

HLI's careful wordplay that it is a "transportation logistics provider" cannot escape the fact that there is at least some indication that the business HLI conducts constitutes freight forwarding. Even if HLI is not the physical mover of goods, HLI admits repeatedly that "[i]t acted as a coordinator of the transportation which would take place on the KCSR" and that "HLI provides project logistics and transportation scheduling for clients, with a specialization in arranging moves involving heavy and oversized loads." (HLI Counterstatement to 56.1 Stmt. ¶ 28). This type of activities is precisely the purview of a freight forwarder. Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 19, 125 S.Ct. 385, 390 (2004) ("A freight forwarding company arranges for, coordinates, and facilitates cargo transport, but does not itself transport cargo."); see also Motorola, Inc. v. Federal Exp. Corp., 308 F.3d 995 (9th Cir. 2002) (stating, in air carrier context (where Carmack does not apply), that "[f]reight forwarders assume the responsibility of a carrier which actually executes the transport, even though the forwarder does not carry the merchandise itself").

The Court finds that HLI may be a "freight forwarder." First, it is possible that in the course of HLI's business it "provides for assembling and consolidating" and "provides for break-bulk and distribution operations" of shipments, even if HLI did not provide such services in this case. See Phoenix Assur. Co. v. K-Mart Corp., 977 F. Supp. 319, 324-325 (D.N.J. 1997); National Motor Freight Traffic Ass'n, Inc. v. U.S., 205 F. Supp. 592 (D.C. Cir. 1962), aff'd 83

---

The term does not include a person using transportation of an air carrier subject to part A of subtitle VII.

49 U.S.C. § 13102(8).

6

S.Ct. 311, 371 U.S. 223, 9 L.Ed.2d 273 (1962) (freight forwarder obliged only to proffer services of assembly, consolidation, breaking, bulk and distribution, but is not required to perform all these services if consignors or consignees wish to have less than proffered service). Second, it appears that HLI assumed responsibility for the transportation of the goods from the place of receipt to the place of destination. Whether I credit the customs broker's bill of lading listing HLI as the "carrier" and "delivering carrier" (Glynn Decl. Ex. C) or KCSR's bill of lading listing HLI as the "shipper" (Harrington Decl. Ex J), it is some indication that HLI assumed responsibility for property belonging to Prolec. Third, HLI used for part of the transportation of the transformers a rail carrier (KCSR), which is subject to the jurisdiction of the Surface Transportation Board ("STB"). See Phoenix, 977 F. Supp. at 325 (denying summary judgment on issue of whether Defendant mover of goods was a freight forwarder and referring to Secretary of Transportation for a determination). Finally, the MOU, whether or not entered before the derailment, seems to suggest that HLI has the capacity to do more than just coordinate services, whether or not it always does so. (See MOU § 3.2.1 (requiring expediting at Laredo, Texas and destination "if HLI is required to offload to the transformer and deliver to pad") and § 4.1 (discussing payment parameters depending on extent of HLI's involvement in transport)).

On the other hand, it is not clear that HLI is a freight forwarder as opposed to a broker.[2] Both property brokers and freight forwarders arrange for carriers, but property brokers do not play a role in the actual assembly or carriage of the goods. Transportation Revenue Management, Inc. v. First NH Inv. Services Corp., 886 F. Supp. 884, 886 & n.2 (D.D.C. 1995)

---

[2] The term "broker" means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation. 49 U.S.C. § 13102.

7

("A property broker arranges the transportation of property by an authorized motor carrier, but is not permitted to act as a carrier. A freight forwarder, by contrast, plays a role in the assembly, consolidation, break bulk and distribution of shipments, assumes responsibility for the shipment from the place of receipt to the place of destination, uses carriers subject to ICC jurisdiction and may act as a carrier").

In contrast to a "carrier" or "freight forwarder," a "broker," if not negligent, is generally not liable for the value of goods lost in interstate commerce. Commercial Union Ins. Co. v. Forward Air, Inc., 50 F.Supp.2d 255, 257 (S.D.N.Y. 1999) ("The Carmack Amendment does not provide for the liability of brokers."); Travelers Indemnity Co. v. Alliance Shippers, Inc., 654 F. Supp. 840, 842 (N.D. Cal.1986). However, "[t]he difference between a carrier and a broker is often blurry. . . and it is apparent from the case law that the carrier/broker inquiry is inherently fact-intensive and not well suited to summary judgment." Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc., No. 09 Civ. 2365(PGG), 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011) (citations and internal quotation marks omitted). The fact that HLI may not have held a broker's license is not dispositive of this issue. See id. at *4-5 ("the law determines status according to the services offered by an entity, rather than by its corporate character or declared purpose.") (citations and internal quotation marks omitted).

In addition to this nebulous dividing line, HLI presents affidavits and exhibits that it never provides or provides for assembling and consolidating and break-bulk and distribution of shipments. (Scott Decl. ¶ 18). Because status as a freight forwarder is a fact-intensive determination, it is simply inappropriate for resolution on summary judgment. See id., at *8

(denying summary judgment because "[Defendant's] status as a broker or carrier cannot be determined as a matter of law").[3]

### B. Alternative Analysis – Intention to Continue Foreign Commerce

The above analysis presumes that the parties intended two separate legs of the transport, and the entirely intrastate rail transportation is not within the STB's jurisdiction for a freight forwarder. However, even if the Court construed the intrastate shipment as an "intention to continue foreign commerce," it would likewise not result in summary judgment. The STB has jurisdiction over freight forwarders and motor carriers for certain transport between the United States and a foreign country. 49 U.S.C. § 13531(a)(3) (STB has jurisdiction "over service that a freight forwarder undertakes to provide, or is authorized or required under this part to provide, to the extent transportation is provided in the United States and is between. . . a place in the United States and a place outside the United States."); 49 U.S.C. § 13501(1)(E) (jurisdiction over motor carriers for transportation "between a place in. . . the United States and a place in a foreign country to the extent the transportation is in the United States").

---

[3] Even if the Court assumed that HLI is a freight forwarder, summary judgment on Chartis's claim of Carmack liability would still be premature. In particular, the Court recognizes that the jurisdiction of the STB is not uniform across carriers. Compare 49 U.S.C. § 13531 (freight forwarders) with 49 U.S.C. § 13501 (motor carriers) with 49 U.S.C. § 10501 (rail carriers). This is significant because a shipment is subject to the Carmack Amendment only if the carrier at issue satisfies the two requirements set forth in Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp. ("Regal-Beloit"), 130 S. Ct. 2433 (2010). Under Regal-Beloit, Carmack liability only attaches for "shipments that start with a carrier that is both subject to the STB's jurisdiction and 'receives [the property] for [domestic rail] transportation.'" Regal-Beloit, 130 S.Ct. at 2445; Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 145-46 & n.13 (2d Cir. 2010) (extending holding of Regal-Beloit to motor carriers and freight forwarders). Thus, a transport for which one carrier would be subject to the jurisdiction of the STB (and thus subject to Carmack liability) will not necessarily expose another type of carrier to liability.

Under this application of the Carmack Amendment, "the critical inquiry is not whether the domestic leg of the shipment crossed a state border but rather it is whether the domestic leg of the shipment was intended to be part of a larger shipment originating in a foreign country. If it is part of such a larger shipment, then it is a shipment "between a place in ... the United States and a place in a foreign country to the extent the transportation is in the United States". . . and the Carmack Amendment applies." Swift Textiles, Inc. v. Watkins Motor Lines, Inc., 799 F.2d 697, 701 (11th Cir. 1986). In a decision that was largely abrogated by Regal-Beloit, the Second Circuit extended the jurisdiction of STB under the "continuation of foreign commerce" provision to include any shipment traveling in foreign commerce, regardless of the direction of travel. Sompo Japan Ins. Co. of America v. Union Pacific R. Co., 456 F.3d 54, 68-69 (2d Cir. 2006).

Even assuming that the Swift/Sompo's expansive interpretation of "continuation of foreign commerce" is still applicable after Regal-Beloit—which the Court notes is highly unlikely[4]—Chartis does not adequately establish that this interpretation should apply here.

First, the Swift court talks out of both sides of its mouth, making its conclusion less sure. Compare Swift Textiles v. Watkins Motor Lines Inc., 799 F.2d 697, 701 (11th Cir. 1986) ("Where a shipment involves transportation in a foreign country, the domestic leg of the journey will be subject to the Carmack Amendment as long as the domestic leg is covered by a separate bill or bills of ladings.") with id. at 700 ("Applying the "intent" analysis, the fact that Watkins issued a separate bill of lading for the final intrastate leg of the journey is not significant."); see

---

[4] See also Ingram Micro, Inc. v. Airoute Cargo Exp., Inc., 154 F. Supp. 2d 834, 838-39 (S.D.N.Y. 2001) ("The instant case involves a transport of goods from an adjacent foreign country to the United States by ground, an area not regulated by the I.C.C. . . . Because the Carmack Amendment is limited to transport of goods by ground between states and from the United States into a foreign country, by its terms, the Amendment does not apply to this action.")

Sompo, 456 F.3d at 61-63 (acknowledging "[t]he disconnect between Swift's reasoning and the articulation of its holding"). Second, whereas Sompo dealt with a single continuous intermodal shipment under a through bill of lading, Plaintiff has adduced no such evidence.

The shipment was certainly not intermodal because it only involved rail transportation in two segments. Moreover, all the Court has before it are bills of lading listing Laredo, Texas as the "origin city" and Port Arthur, Texas as the "destination city." Standing alone, this does not suggest anything about foreign commerce and only suggests a shipment that is outside the STB's jurisdiction for a freight forwarder. On this record even under a "continuation of foreign commerce" theory, summary judgment would still be inappropriate. Chartis's motion for summary judgment that HLI and FMMC are liable under the Carmack Amendment is denied.

C. HLI's Failure to Procure Insurance

Chartis next seeks summary judgment for HLI's alleged failure to procure insurance pursuant to the MOU. Section 5 of the MOU sets forth insurance requirements that HLI will maintain at its own expense: $1mil[lion] [general liability] insurance coverage; $1mil[lion] Cargo insurance; [and] $1mil[lion] bond." Torres Decl. Ex. A at CSM00008. If the MOU was in effect at the time of the derailment, there seems to be little dispute that, whatever the reason, whether intentional or otherwise, HLI did not have the required insurance and would be liable for breach of contract.

However, HLI contends (albeit not in the body of its opposition brief) that despite the printed date on the MOU being listed as February 1, 2010, the MOU was in fact not entered until March 30, 2010, more than two weeks after the derailment. (HLI/FMMC Counterstatement to Chartis Rule 56.1 Stmt ¶¶ 77-78; Scott Decl. ¶¶ 13-16 & Ex. A and B). Furthermore, Torres, one of the signatories of the MOU, does not recall when it was signed and believes the photograph

with he and Michael Scott was taken at the signing of the MOU. (Torres Dep. 60-67, 98-103). Based on the evidence HLI presents, the photograph was taken on was March 30. (Scott Decl. Ex. A and B).

If HLI's contention is true, the MOU was not a valid contract between HLI and Prolec at the time of the derailment, therefore preventing summary judgment on the breach of contract for failure to procure insurance. Trans-Pro Logistic Inc. v. Coby Electronics Corp., No. 05 CV 1759(CLP), 2012 WL 526764, at *7 (E.D.N.Y. Feb. 16, 2012) ("[I]t is well-established under New York law that a party alleging an action for breach of contract must prove the following: "(1) a contract; (2) performance; (3) breach by the other party; and (4) damages."); Sachs v. Zito, 28 Misc.3d 567, 573-574, 901 N.Y.S.2d 818, 824 (N.Y. Sup. Ct. 2010) ("As a matter of law, in order to sustain a cause of action for breach of contract it is incumbent upon such party to establish the following: (1) the formation of a contract as to its scope and terms; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage."). Because Chartis's motion for summary judgment for failure to procure insurance is based on HLI's alleged duty under section 5 of the MOU to carry insurance, their motion for summary judgment is denied.

D. FMMC as Alter Ego

Chartis also contends that FMMC is an alter ego of HLI. FMMC is affiliated with HLI and holds a minority membership interest in HLI, holding 28.34% interest. (McLaren Decl. ¶ 11; Russo Decl. ¶ 6). As a minority member, FMMC handles administrative functions for HLI out of FMMC's New York office and FMMC's Chief Financial Officer, Darren Meyers, serves as Chief Financial Officer of HLI. HLI contends, however, that other than administrative functions, FMMC does not perform any business activities on behalf of HLI or through HLI.

Moreover, FMMC has a separate board of directors from HLI and except for Darren Meyers, the companies' Officers are also separate and distinct. (Russo Decl. ¶ 9).

The primary bases for claiming an alter ego relationship are that FMMC acquired the insurance policy on which HLI is a named insured and that the two companies have the same Chief Financial Officer, Darren Meyers. These two facts are used to address almost every issue of alleged corporate domination. Chartis urges this Court to determine that these facts are sufficient to merit piercing the corporate veil on summary judgment.[5] The court declines the invitation.

In New York, "[t]he concept of piercing the corporate veil is a limitation on the accepted principle that a corporation exists independently of its owners, as a separate legal entity." Matter of Morris v. New York State Dept. of Taxation and Fin., 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993). Nevertheless, "[u]nder New York law, a court may pierce the corporate veil where 1) 'the owner exercised complete domination over the corporation with respect to the transaction at issue,' and 2) 'such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001); Network Enterprises, Inc. v. APBA Offshore Productions, Inc., 427 F.Supp.2d 463, 487-88 (S.D.N.Y. 2006) ("Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating

---

[5] Under New York law, "alter ego" and "veil piercing" claims are synonymous. CSX Transp., Inc. v. Filco Carting Corp., No. 10–CV–1055 (NGG)(JMA), 2011 WL 2713487, at *3 n.1 (E.D.N.Y. July 11, 2011) (citing TNS Holdings, Inc. v. MKI Secs. Corp., 92 N.Y.2d 335, 339-40, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998)); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 291 n.74 (S.D.N.Y. 2005). The terms will be used interchangeably here.

corporation that leads to a wrong against third parties.") (quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991); see also Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979) ("Because New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.").

Determining that veil-piercing is appropriate is a "fact-specific" inquiry, and courts consider many factors, including: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. MAG Portfolio, 268 F.3d at 63.

With respect to control, New York courts require "not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985) (citation omitted). Thus, a showing of limited overlap is not actionable. To the contrary, some indicia of corporate collaboration are to be expected. Fletcher v. Atex, Inc., 68 F.3d 1451 (2d Cir. 1995) (affirming denial of summary judgment of alter ego theory because, *inter alia*, subsidiary's participation in parent's cash management system was sound

business practice, not evidence of undue domination or control and requiring parent's approval for major decisions was typical of parent corporations and, likewise, not undue domination); American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988) (existence of interlocking directorates between a parent and a subsidiary is a "commonplace circumstance of modern business [that] does not furnish such proof of control as will permit a court to pierce the corporate veil"); Oppenheimer & Co. Inc. v. Deutsche Bank AG, No. 09 Civ. 8154(LAP), 2010 WL 743915, at *4 (S.D.N.Y. Mar. 2, 2010) (parent's admitted control over subsidiary's financial and operational policies "consistent with an ordinary stockholder-corporation relationship" and risk and capital management supervision by parent's board insufficient to give rise to alter ego liability); McAnaney v. Astoria Financial Corp., 665 F. Supp. 2d 132, 144-45 (E.D.N.Y. 2009) (collecting cases).

Viewing the evidence in the light most favorable to the non-movant, I cannot grant summary judgment. Even Chartis admits it has not adduced key factors of corporate domination during discovery. (Chartis Mem. at 21, 24); In re Ski Train Fire in Kaprun, Austria on November 11, 2000, 342 F. Supp. 2d 207, 216 (S.D.N.Y. 2004) (declining to pierce corporate veil where plaintiffs "provided no evidence that [subsidiary] failed to comply with corporate formalities, make its own day-to-day operational decisions, or remain sufficiently capitalized"). Furthermore, what little evidence Chartis has put forth—minority interest and limited overlap of officers—does not come close to meeting the summary judgment standard on the issue of corporate domination. The Court is not convinced that the fact that they share insurance and some administrative duties is reason enough to conclude that they have failed to observe corporate formality. Therefore, Chartis's motion for summary judgment that FMMC is the alter ego of HLI is denied.

II. Chartis's Motion for Sanctions (Dkt. No. 206)

Chartis separately seeks sanctions against HLI under Rule 11 of the Federal Rules of Civil Procedure for allegedly making arguments contrary to clear precedent. (See Chartis Mem. for Sanctions at 2). Chartis seeks sanctions because HLI/FFMC have allegedly taken inconsistent positions depending on the point they are arguing. Chartis also argues that HLI/FFMC make arguments that are clearly contravened by prevailing law.

A party may be subject to sanctions under Rule 11 for making frivolous claims in a pleading. Fed. R. Civ. P. 11(b)(2) and (c). Rule 11 is violated when it is "clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 167 (2d Cir.1999); Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir. 1986) ("Rule 11 is violated only when it is patently clear that a claim has absolutely no chance of success.") (internal quotation marks and citation omitted); Fed. R. Civ. P. 11(b)(2). "The operative question is whether the argument is frivolous, i.e., the legal position has "no chance of success," and there is "no reasonable argument to extend, modify or reverse the law as it stands." Fishoff v. Coty Inc., 634 F.3d 647, 654-55 (2d Cir. 2011) (quoting Morley v. Ciba–Geigy Corp., 66 F.3d 21, 25 (2d Cir. 1995)). The district court has discretion in deciding whether or not to impose sanctions. WD Music Products, Inc. v. Muller, 506 F. App'x 43 (2d Cir. 2012). "Sanctions under Rule 11 are appropriate only in extraordinary circumstances." Stern v. Regency Towers, LLC, 886 F. Supp. 2d 317, 327 (S.D.N.Y. 2012) (internal quotation marks omitted).

Despite Chartis's contention that HLI's positions are "so flawed" and "not warranted by existing law," (Chartis Mem. for Sanctions at 2), the Carmack Amendment is hardly a beacon of clarity. It is a complex statutory scheme that applies differently depending on the carrier at issue.

16

Moreover, it has undergone numerous and significant revisions through regulation and interpretation in case law (which itself is voluminous, heavily fractured, and in flux). HLI/FMMC's refusal to concede the application of the Carmack Amendment or that it was a freight forwarder was not frivolous, and quite frankly, not surprising. These are not the extraordinary circumstances that counsel Rule 11 sanctions. A party is entitled to make a defense and a case is not frivolous because it urges a certain interpretation of the gray area in a complex legal scheme. Chartis's motion for sanctions is denied.

III. HLI/FMMC's Motion for Summary Judgment (Dkt. No. 192)

Having determined that the Carmack Amendment does not apply to HLI's involvement with the shipment, I turn to the claims of HLI's motion for summary judgment. HLI seeks an order dismissing the First, Second and Third claims in Chartis's Second Amended Complaint.[6] If the Carmack Amendment were applicable, it would preempt the common law claims alleged in the complaint. However, because that legal scheme does not apply to HLI, the question becomes whether Chartis's common law claims can serve as a basis of liability against HLI. HLI analyzed its lack of liability under New York state law while Chartis contends that, in the absence of the Carmack Amendment, federal common law applies.

---

[6] HLI erroneously contends that those are the only remaining causes of action because the Fourth Cause of Action for fraudulent inducement was dismissed by previous order. HLI/FMMC Mem. in Support of Summary Judgment at 3-4 and Reply at 9-10; see Rakoff Order (dismissing fraudulent inducement claim). Reading the order in its entirety, it is clear that the order only dismissed the fraudulent inducement claim and temporarily stayed the case to permit resolution of certain issues in Texas state court (HLI's previously filed suit for declaratory judgment). Although the claim for breach of contract for failure to procure insurance was not parsed out as a separate cause of action, the parties were on notice of the allegations of breach of contract on this basis. The failure to procure insurance claim is still a live issue as Chartis has failed to establish its entitlement to summary judgment. See supra at Part I.C.

17

Although most forms of interstate transportation are governed by federal law and thus preempt state regulation of common carriers, Ingram Micro, Inc. v. Airoute Cargo Exp., Inc., 154 F. Supp. 2d 834, 839 (S.D.N.Y. 2001) (citing Adams Express Co. v. Croninger, 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913)), "federal common law is properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute, but the use of common law will fill gaps in the congressional statutory pattern. In sum, common law principles have long been used to fill gaps in or supplement the Interstate Commerce Act. Therefore, federal common law may be applied to this carriage of goods, rather than the laws of any of the relevant states," id. (citations omitted).

The Court agrees with Chartis that federal common law would be appropriate, but only if HLI is a common carrier. This is an issue that has not yet been resolved. As discussed supra Part I. A, HLI may very well be a freight forwarder. But this basic point of has not yet been established unequivocally. Furthermore, it is unclear whether federal common law is as expansive as the Carmack Amendment and would assign liability to a carrier that was not actually in possession of the goods at the time of the alleged injury. See Reider v. Thompson, 339 U.S. 113, 119, 70 S.Ct. 499, 94 L.Ed. 698 (1950) (Carmack intended to "relieve cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods"). Because there are still open questions whether federal common law or the law of the forum (New York) applies and whether federal common law would reach an intermediary, HLI's motion for summary judgment to dismiss the remaining causes of action must be denied.

CONCLUSION

For the reasons discussed herein, Chartis's motion for summary judgment (Dkt. No. 191) is DENIED in its entirety. Likewise, its motion for sanctions (Dkt. No. 206) is DENIED. HLI's motion for summary judgment to dismiss the remaining causes of action (Dkt. No. 192) is also DENIED.

SO ORDERED.

Dated:   March 13, 2014
         New York, New York

                                        _____
                                        **ANDREW L. CARTER, JR.**
                                        United States District Judge